The Honorable Detectives of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the United States Court of Appeals for the Fourth Circuit are admonished to give their attention for the court is now sitting. God save the United States and this Honorable Court. Thank you. Good morning, counsel. Mr. Becker, you may proceed. Thank you, Your Honor. As I said, my name is Mike Becker on behalf of the appellants. The district court found, and Red River argues here, that Section 702 of SMACRA, the Surface Mining Control and Reclamation Act, provides a legal bar to this action because allowing it to proceed would alter the function of the Clean Water Act permit shield. The text of the permit shield and of Section 702 of SMACRA, however, do not permit such a result. In fact, it would do damage to the text of the permit shield section and the substantive provisions of SMACRA to interpret it that way. Moreover, a narrow interpretation of Section 702 is necessitated by longstanding principles of statutory interpretation. First, its two statutes should be interpreted harmoniously, if at all possible. And second, that a savings clause should not be read to damage the substantive provisions of a statute. I'd like to first turn to the statutory text. SMACRA savings clause provides. Nothing in this chapter shall be construed as superseding, amending, modifying, or appealing the Clean Water Act, among other statutes. In order for the savings clause to take effect, there must be something to be superseded, amended, modified, or appealed. Here, what Red River and the court below pointed to was the Clean Water Act permit shield. That section provides compliance with the permit issued pursuant to this section shall be deemed compliance for purposes of Section 1319 and 1365 of this title, with Sections 1311, 1312, 1316, 1317, and 1343 of this title. There are two important provisions of that text that, when read either together or separately, prevent a textual interpretation that supports Red River's argument. First, the phrase, for purposes of Sections 1319 and 1365 in the Clean Water Act permit shield, must be given effect. Section 1319 is the Clean Water Act's general enforcement section, and Section 1365 is the citizen suit enforcement section. The statement, or the phrase, for purposes of Sections 1319 and 1365 can only be read to limit the effect of the permit shield to Clean Water Act enforcement actions. There is no mention of any other statutory or enforcement provisions, and certainly not the citizen suit sections of SMACRA 30 U.S.C. Section 1270 under which this case is brought. Moreover, there is a specific list of enumerated sections for which limited immunity under the permit shield is granted. If there is tension between the Clean Water Act and SMACRA in this case, it comes from the operation of Section 1313. Plaintiffs are enforcing water quality standards which are derived from Section 1313 under the Clean Water Act. However, Section 1313 is not listed in this enumerated list of provisions of the Clean Water Act for which limited immunity is given. What Red River's interpretation would do would turn this permit shield into a broad grant of immunity for all environmental enforcement actions, and the text does not support that interpretation. Counsel? Yes, Your Honor. Could a citizen bring a suit in this scenario under the Clean Water Act to enforce 1313's provisions? To put SMACRA aside, could a citizen bring a Clean Water Act case based on your textual understanding of those statutes? Your Honor, the way the Clean Water Act works is the general provisions of the Clean Water Act are turned into specific limitations in an NPDES permit under 33 U.S.C. 1342. That's the National Pollutant Discharge Elimination System section. And water quality standards can be enforced if they are included in a permit. Then they can be enforced that way. I would point out that SMACRA… Right, so that wouldn't answer the question, though. What I'm saying is, in this case, given the permit, could a private citizen bring a suit in light of the permit's bar under the Clean Water Act? Only if those water quality standards were specifically referenced in the permit. And are they, in this case, specifically referenced in the permit? The ones that you're challenging, are they specifically referenced in being violated? No, Your Honor, I do not believe so, or we would have brought that claim. Our claim under the Clean Water Act below was brought for an unpermitted discharge. Right, so what I'm trying to get at, and what I'm having trouble understanding of your argument, is that if under the Clean Water Act you could not bring that case, why that doesn't suggest that you should not be able to bring it under SMACRA given the, whatever it is, 702? The numbers escape me, but the savings clause that exists. Certainly, Your Honor, and I believe, again, it's because of the text of these two statutory provisions. SMACRA's savings clause says that it shall not supersede, amend, modify, or repeal the Clean Water Act. There has to be something which is read to be superseded, amended, modified, and repealed. And the only thing that the court below or Red River point to is this permit shield section. But by the text of the permit shield itself, this citizen suit action is outside the scope. Therefore, because we're outside the scope of the permit shield, there's nothing to trigger the savings clause. Explain to me one time, because I'm not following at all. Why are you outside the scope of the permit shield? I thought you just said that if you were under the Clean Water Act, you would be inside the scope of the permit shield. We would be if we were under the Clean Water Act, Your Honor. But this is a citizen suit under SMACRA. Which can go no broader than the Clean Water Act suit. That's what the savings clause provides. The savings clause text does not say it can go no further than the Clean Water Act. It said it should not supersede, amend, modify, or repeal. And again, there has to be a textual provision that that interacts with. And that provision here is the permit shield. But the permit shield states that it is for purposes of sections 1319 and 1365. Those are the enforcement sections of the Clean Water Act. The permit shield bars a citizen suit under the Clean Water Act, or a general enforcement suit under the Clean Water Act, if the permit is being complied with. But here, this is outside. Mr. Becker? Yes, Judge Newman. How do you take into account our opinion in Piney Run? Where we said that the shield is broader than the permit. All discharges adequately disclosed to the permitting authority are within the scope of the permit's protection. And the hypothetical was even if the discharges exceeded the permit amounts, the idea was if they were disclosed, they were covered by the shield. And this was Judge King's decision in Piney Run, and he went at it in some length. And it seems to me it's generally being followed. Yes, Your Honor. We're familiar with the decision in Piney Run. That was an enforcement action under the Clean Water Act. Well, I'm following up on Judge Richardson's question because I think it is a very telling question. If we start with the Clean Water Act liability and the mining company is in compliance, in other words, you could not sue under the Clean Water Act. What they're doing now satisfies that permit. Then you look to not only the statutory engagement you're talking about, but there's that D.C. circuit, which is pretty persuasive, talking about the relationship between SMACRA and I'm talking about the surface mining regulation, yes. Yes, I would first point out that, again, Piney Run was in the context of the Clean Water Act enforcement section. It did not deal with a different environmental statute. What we're dealing with here is a separate statute, Section 1270 of the statute. No, my question is focused just on what Judge Richardson raised. In other words, he started with the notion, could you have sued for these facts under the Clean Water Act and succeeded? The suggestion he was raising in his question was that they were in compliance with the permit as construed by Piney Run. Yes. Your Honor, my point is, I will concede to Judge Richardson's point that we could not bring this under the Clean Water Act and did not bring this under the Clean Water Act. SMACRA provides a separate source of authority for enforcement. Clearly, it does. SMACRA has regulations that go beyond clean water. But SMACRA pretty clearly says, and this was construed by the D.C. Circuit, pretty clearly says it's going to yield to other statutes so there's not tension. In other words, if you have a permit under the Clean Water Act, the SMACRA wanted the courts to not impose a liability. As a matter of fact, in this case, the permit is under SMACRA. It's under Clean Water Act and SMACRA. So you have to answer that question is they are permitted to discharge what they're discharging now under SMACRA. Your Honor, I think there's two points in there. First, this is a jointly issued permit, but as the district court recognized, there are separate sections implementing SMACRA and the Clean Water Act, and those are different sections. In fact, the information, the data that was used by the plaintiffs in the underlying suit came from a portion, the monitoring of the underdrains, which the district court judge recognized was specific to the SMACRA section. As to in-ray surface mining litigation, Your Honor, I would say that in-ray surface mining litigation dealt with the promulgation of statutes. There, the director of OSM was seeking to promulgate statutes that were in direct conflict with statutes that existed under EPA's jurisdiction on the Clean Water Act. The court did not say that those regulations could not be promulgated. What the court says was they had to be consistent. What in-ray surface mining litigation is all about is consistency between SMACRA and the Clean Water Act. Again, what I would say here is that you have to have something to come into conflict, something to be altered or amended or modified to trigger SMACRA's savings clause, and the only thing that has been identified here is the permit shield. Yes, Your Honor. Can I ask what I hope is a simple question, but just to make sure that I understand? SMACRA governs both point source and non-point source pollution. Is that correct? That's correct.  That's correct, Your Honor. There's nothing in SMACRA that I'm aware of that makes a distinction, and specifically the performance standards that we are suing under, that we are seeking to enforce, speak of discharges without a distinction between point source and non-point discharges. The Clean Water Act is point source. The Clean Water Act, Section 402, 1342, the NIPTI section, is specific to point sources, but the Clean Water Act does have other sections, such as 1319 of the Act, which do regulate non-point sources. So neither is fairly characterized as specific to point sources or non-point sources. Your Honor, I would also just like to point out that accepting Red River's interpretation would do damage to both the structure and the text of SMACRA by disallowing the enforcement of performance sections, which are part of the Act. I see I'm out of time. Thank you, Your Honor. Good morning, Your Honor. My name is David Carr. I'm here on behalf of the Applee Red River Coal Company. I'd like to address the subject that Mr. Becker was addressing in Judge Richardson's question. Just to make sure to be clear here, there was a claim in this case brought under the Clean Water Act, and the holding of the district court was that the permit shield precluded that action. And so summary judgment was awarded on the Clean Water Act claim, and that decision was not appealed. And to a great extent, Mr. Becker's argument is that the permit shield should not apply, but that is a question that was not appealed here. Mr. Becker said that the permit shield holding, that we are outside the scope of the permit shield here. That is an issue which was dealt with in Piney Run. Judge Gregory was on the panel in Piney Run. He will recall that the issue in Piney Run was, what was the scope of the permit shield? And the court's analysis was that 1342K was, in fact, ambiguous and under Chevron, the court adopted the interpretation of 1342K that was applied by the EPA in a case called Ketchikan from many years ago. And the holding of Piney Run was that the permit shield defines the scope of compliance with the Clean Water Act. So a quote from the case, that compliance is a broader concept than merely obeying the express restrictions set forth on the face of the MPDES permit. All discharges adequately disclosed to the permitting authority are within the scope of the permit's protection. And so Mr. Becker's arguments about the text of 1342K, that it refers only to sections 1319 and 1365, that it does not refer to section 1313, where the water quality standards are kept, really don't matter because Piney Run decided that 1342K itself was ambiguous and its scope encompassed everything that was disclosed within the reasonable compliance of the permitting authority. So those arguments really don't apply here. Not to mention which, they are essentially attacking the district court's decision on the Clean Water Act claim, which has not been appealed. I also want to point out to make sure that the court is aware and emphasize that the discharges from the valley fills at the North Fox Gap Mine are not unregulated. Red River has conducted monitoring of the discharges from the valley fills since before this permit was first issued many years ago. And the permit continues to require that we conduct under-drain monitoring and provide that data to DMLR, and we are doing that. And DMLR considered that data when deciding on the effluent limitations and other conditions of the permit. And I also want to point out that as a district court noted, DMLR's internal guidance requires the agency to assess compliance with both numeric and narrative water quality standards. And it's those narrative water quality standards that are the basis of the SMACRA claim in this case. And during the next permit cycle, when this permit comes up for renewal, which it has, we have applied for a new permit, DMLR will evaluate all this monitoring data and can impose an effluent limitation on these discharges if it believes that that is required. So this is not a case where there is a loophole or a gap in regulation by DMLR. Red River is in compliance with the Clean Water Act by operation of the permit shield. This is a case of regulatory overlap between the Clean Water Act and SMACRA. And SAMS, the appellants, acknowledge that in their opening brief at page 32. And where there is regulatory overlap, Section 702 of SMACRA dictates that SMACRA cannot be construed to modify or supersede the Clean Water Act. And that includes modifying the scope of the permit shield. All of the circuit courts that have addressed Section 702, and that includes the Fourth Circuit, agreed that Congress intended that the Clean Water Act governs where there is regulatory overlap between the two acts. So this case, a case we cited in a footnote in our brief, the Kempthorne case, which was not directly on point, but the court stated Congress expressly disclaimed any intent to supersede or preempt statutes with overlapping provisions. And in resurface mining regulation, which the court referred to, the Congress meant exactly what it said. Where there is overlap of regulation, the Surface Mining Act is not to be interpreted as altering in any fashion the Federal Water Pollution Control Act. And the Sixth Circuit, in the ICG hazard case, adopted that reasoning from the in-rate surface mining regulation and held that it applied. And I want to talk about ICG hazard for just a moment, because that case presents the same factual scenario that we have here. It was a case where there was a claim under the Clean Water Act for discharges of a pollutant called selenium, which were not expressly included in the permit. It was a general permit, and that was the issue there. And the court held on the Clean Water Act claim that the permit shield applied. And so one of the issues on the appeal was, what was the effect of the application of the permit shield in that case on the SMACRA claim? And the court held that the Sierra Club, which was the plaintiff in that case, that their claims under the Surface Mining Act are effectively barred by operation of the permit shield under the Clean Water Act. So the one issue before this court is whether it should adopt ICG hazard. And so I think an issue for the appellant that hasn't been addressed here is, why should this court not adopt the holding in ICG hazard, which is on the same, for purposes of this issue, is on the same faxes here. And the appellant only offers two arguments in their brief for that. The first is that they say that ICG hazard didn't consider the fact that Section 702 is what they call a savings clause, and that the authority from the Supreme Court in two cases called U.S. v. Locke and Guyer v. American Honda apply and do not allow the Section 702 to overcome a substantive provision of SMACRA. The problem with the argument about the savings clause, and it's primarily in the reply brief, is that the appellants treat every statutory provision on which they can put the label savings clause the same. But these statutory provisions vary quite widely. And in particular, most savings clauses, most things that are called savings clause, are a statutory provision that would save or preserve a claim under the common law or under some state law. And that is the case for all three cases that are cited in the opening brief. Those cases being Locke and Guyer and another one called AT&T. All three of those cases dealt with a clause that preserved a state law cause of action. And the issue was, how did that apply when there was some other provision in the acted issue, and they came perhaps in conflict? But cases addressing a statutory provision which preserves state law causes of action aren't relevant to a provision like Section 702, which addresses the interaction of two federal statutes. So Section 702 doesn't just preserve or save a cause of action under the Clean Water Act. It bars MACRA from being construed to modify or supersede other statutes, including the Clean Water Act, including other federal law relating to the preservation of water quality. And under the planned language... Yes, sir. Can I ask the same question that I asked your colleague earlier? The permit at issue here, the NPDES or whatever the acronym is, is a point source permit. Is that fair? Your Honor, it's a little more complicated than that. I thought it was. Explain to me that a little bit. Yeah. The permit here, DMLR administers both the Clean Water Act program and the SMACRA program. And they issue a joint permit under both programs. And when you read the permit, the distinction between what they are regulating under each program is not clear. The district court found in this case that they were regulating these discharges under the SMACRA side of the permit and not under the NPDES or Clean Water Act side of the permit. So it deals with both point sources and non-point sources because it is a joint permit that is issued under both programs. If that answers your question. So take the hypothetical. A hypothetical Clean Water Act NPDES permit is a point source permit, though. Yes, in general. But as Mr. Becker pointed out, there are some provisions of the Clean Water Act which regulate non-point source pollution. And you could get an NPDES permit for the non-point source provisions of the Clean Water Act? Or is the permit itself limited to point source? No, the permit itself is not limited to point source. That answers your question. And so our position here is that this is a plain language case. That the plain language of Section 702 applies here and it would alter or modify the protection of the permit shield if it were to apply to provide that there were no protection here. One argument that was made in the opening brief that SAMS didn't include in its reply brief is that there must be a conflict between the Clean Water Act and SMACRA. And there's no conflict here. But of course, Section 702 doesn't require a conflict. And in addition to that, there is a conflict here between application of the SMACRA claim and the permit shield. I want to make clear that the standards applied for under the two acts are the same. And in fact, that was the case in ICG Hazard as well, where the Selenium standards that applied in the Clean Water Act were also the same standards applied by SMACRA. That doesn't matter because the issue is not whether the two statutes apply the same standards, but how they apply them. And here, because of the permit shield, that creates a conflict. And the issue here... Mr. Tompkins? Yes, yes, sir. Would you address what it would to make of the fact that EPA had objections to Virginia's permit and they were never withdrawn? Does that have an impact in terms of in this case? No, it doesn't because the objections weren't resolved. So the permit remains in force. And so if the permit is in force... You started with saying that when the EPA objects and those objections have not been removed, that automatically that means that the permit would be in force. And then you would, I think technically you would revert back to the prior permit. All right, so what you're saying, you operated on the permit that was valid, but not the permit that was last proffered. Correct. Correct. I think... Hold it. Let me ask you something on that question. The EPA, there was a communication gap and the EPA didn't respond to various provisions and explanations were provided, but the current permit was issued and it is in force just because the EPA took the position that until those things were resolved it was invalid doesn't mean it was invalid and the plaintiffs have not challenged the validity of the permit. I think that's absolutely correct. In this case. Your Honor. Yes, you're absolutely correct. The 2016 permit, which is the current permit, was the one that the EPA challenged. We responded. It never got resolved. And the district court treated that permit as being the permit in force. But that's my point. You just seem to concede that you weren't under the current permit, you were under the prior. And my point is that it seems to me no one has challenged or determined invalidity of the current permit. And so for purposes of this litigation, the current permit is what we're looking at, isn't it? I think that's right. Yes, Your Honor. And if I misspoke, I'm sorry. I don't see how that could be. As you said, you conceded that you can't be under because they never withdrew the objection. And therefore, that's why I ask you, what authority do you have to say that it's not a matter of whether or not the other side object to it. We have to conclude that the statute's status is. It doesn't change because of whether the other side object to it or not. The current permit, you don't have any basis for it. That's why I ask you, what's your authority to say when the EPA makes an objection to the state's permit, and if never the objections have not been withdrawn, they say that automatically the last one proffered automatically is valid until that's resolved. What's your authority for that, case law or otherwise, or regulatory authority? Judge Gregory, I'm frankly not prepared to offer you that authority, but I can tell you that that's the law. And this was an issue that was never— If that's the law, then you should be able to say what that law is, statutory or regulatory. And as I'm suggesting, what happened? Why would the EPA—what changed? They have the objections. The objection is a full stop. You mean to tell me a federal agency makes an objection and then it's not resolved automatically. It means that you can carry on? That's a strange law and application of these things that are very important to our environment. So I'm asking you, what do you do with that? And you said that it makes sense what you said before, that we have to operate on the one that's previously—that's been valid, but not the one that's still in progress. It's best that it's in court. And it has no validity. We're in a—procedurally, where it ended up. You're right. EPA objected. It was responded to. Then DMOR went ahead and issued the permit anyway. And so whether—so we have an issue where there's either one or two results here. Either the 2016 permit is valid, or because we had applied for the 2016 permit, the earlier permit continues to remain in force until the next permit issues. So it's one or the other. We did not litigate in this case—excuse me, Judge Richardson. Where does DMLR get the authority to issue the permit? Isn't that provided by the federal regulatory system? Yes. The authority to issue the permit is delegated to DMLR under the statute. And so why—I guess maybe I just don't understand, but why would— if DMLR has the decision-making authority under the regulatory structure, the EPA or a private citizen could object. But the ultimate authority is DMLR's. So they can just say, we disagree with the EPA, and we're going to go ahead and issue the permit. Why is that not a permissible answer for DMLR? The way the statutory scheme works, after it's issued, EPA has to approve it. That's right. That's approval. It's not that states can just—federalism is strong, but it's not that strong. Yes. So in response to your question, Judge Gregory, and I think also in response to your question, Judge Niemeyer, we have this situation where 2016 permit issued and EPA objected. So if it either is in force or if it's not, we are still protected by the earlier permit. And frankly, that was not an issue that the appellant raised at the district court. And it's not an issue that— I understand that it's not an issue in this case, the validity of the permit. Everybody's assumed that there's a permit in place under the Clean Water Act. My question really is, this all occurred when? In 2016? 2015? These exchanges with the EPA. Right. I think they were roughly 2016. Yeah. So let's assume 2016. What has occurred in the operation of that permit over the four years up until now? I mean, that permit was issued by the state regulatory authority, and everybody's operated under that petition. What has the EPA said since then? Nothing. The information, the letters back and forth that were exchanged are all in the record. I understand, but after that first exchange where the EPA raised some points and the state authority answered those points in a letter and then issued the permit, my question is, did the EPA then come back and say we still object, or did they just stop communicating, or what? Yes. My recollection, and I know it's in the brief, is that the EPA did respond to DMLR's comments and did say we continue to object. And then everyone operated under the 2016 permit. We've done the monitoring and whatever's required. I see my time has expired, Your Honor. You did so at your peril. The EPA last word was we've read your response to our objections, and we continue to object. No, sir, I don't think that's at our peril. And that's the point I was trying to make, was that if the EPA doesn't approve it and it's not enforced, though everyone operated that was enforced, and I'm not conceding that it wasn't, but that you would go back to the last permit, that as long as we applied for a new permit, the permit in place, I don't remember the date of it, I think it was probably three years before, continues to be in effect until whether or not the new permit will be issued is resolved. So we are protected by one or the other. No, that's a fallacy or false dilemma. No, the other, the third choice is that, no, you don't have any automatic continuation of that permit. That's why you had to seek the EPA's blessings, and you didn't get them. As a matter of fact, they objected to it. So that's why I asked you before, what is your authority for saying that you have this continuation of the last valid permit? And your Honor, I apologize, I can't cite you the code section as we stand here today, but that is the way the regulatory system works. Even right now today, we've applied for a new permit, and we're waiting for DMOR to issue that permit, and the last valid permit continues to apply. And let me just be clear, that is a... Can I ask, since this issue wasn't raised below and hadn't been briefed, will you provide us a letter with the authority that you're referring to when court's over? Sure, that's easy to do. This was not an issue. This would be a claim of a Clean Water Act violation for a non-permitted discharge. That could have been raised by SAMS below. It was not raised, and they did not appeal the district court's finding on the Clean Water Act  Thank you, Your Honor, unless you have any more questions. Thank you, Mr. Carr. Mr. Becker? Thank you, Your Honor. A couple points I would like to make in response. First, on the Piney Run issue, Piney Run was clear, it states on page 269 of that opinion, that an NPDES permit holder is yielded from Clean Water Act liability for discharges in compliance with its permit. The liability that is... But read the next sentence. Read the next sentence. It is liable for... As EPA has determined, however, however, compliance is a broader concept than merely obeying the express restrictions set forth in the face of the NPDES permit. All discharges adequately disclosed... Are within the scope of that permit's protection. Yeah. But this is all within the context of Clean Water Act liability. In order to turn the permit shield into something that would comport with Red River's interpretation, you would have to read the sections for purposes of sections 319, and 1319, and 1365, broader than the text would support. You would have to somehow read that section as including section 1270 of SMACRA. I will agree with Mr. Carr that the Clean Water Act claims here are gone. They... We were ruled against by the district court. Those claims actually were for an unpermitted discharge because we felt that the permit did not cover... The NPDES permit did not cover those discharges. But we did not appeal that because when the district court found that they should, in fact, have been covered, that they were point sources that should have been included in the NPDES permit, we accepted that the permit shield applied to bar Clean Water Act liability. What we did not accept was that the permit shield would extend so far as to bar compliance under all environmental stat... Or to bar citizenship enforcement under all environmental statutes, including our enforcement action under SMACRA. Yes, Your Honor. Just so that I'm clear, you have not claimed in the district court or in this court that there is no permit. There is no NPDES permit that's effective at all because of the EPA's objections. We did not make that claim, Your Honor. You are correct. What we did... Does that mean that there's a problem with the 2016 that the regulatory system keeps the old permit in place until a final decision is made on an applied for permit? I would say, Your Honor, as Mr. Carr said, that issue was not briefed. However, that does... That is consistent with my understanding of the Clean Water Act. I would ask if there is a letter that we'd be allowed to look into that issue and respond. It's amazing that you want to respond to something that you already conceded to council. Why would you concede to something and now you want a 28-J letter? Your Honor, I have not examined... Excuse me. I have not examined the issue for this argument. Excuse me. I have something to say. I'm sorry, Your Honor. Why would you concede to something you don't know the answer to and then you would say, I want a 28-J letter so I can respond to it? That's what my question is. That's just the construct of advocating. Perhaps my concession was an error, Your Honor, and thank you. If I may correct myself, I would like to examine that issue and respond. Thank you. Go ahead if you have something else to say. Yes, Your Honor. I also want to deal with the citation or the reference to the ICG hazard case. I would say the ICG hazard case, also the Apogee case that are pointed to in the police brief, those were cases that did not examine the text of the permit shield. Each court to look at this question so far has found that there is some tension between the savings clause or some operation of the savings clause through the Clean Water Act permit shield. However, none of those courts have actually examined the text of the permit shield itself. And when you look at that text, I would say that two textual changes would have to be made to find our case within the scope of the shield. First, as I've mentioned repeatedly, the four purposes section, which references 1319 and 1365, would have to be expanded to include section 1270. Additionally, the enumerated list of Clean Water Act provisions for which immunity is given under the Clean Water Act would have to be extended to include section 1313, from which water quality standards are derived. And until you make those two textual changes, you cannot find that this case is within the scope of that permit shield. I would go further and argue that there are other structural elements that support this interpretation. First, the statutory interpretation principle that says you should interpret statutes harmoniously whenever possible. To accept Red River's interpretation of the permit shield would do damage to SMACRA's text. There are three sections of SMACRA, at least, which would be impaired by the operation of the savings clause and the permit shield, as Red River intends. Those are section 1265, which mandate the direct applicability of performance standards to the operator. Section 1270A, that's the citizen suit authority under which this case is brought, which specifically provides that citizens are entitled to enforce any rule or regulation under the statute or issue pursuant to the subchapter. It is not limited to the permit, as the corollary Clean Water Act section is. And then lastly, section 1255, which specifically allows for the operation of state law that is more stringent than SMACRA. And one key point that I think has not been mentioned here is the performance standards that we are enforcing here are Virginia SMACRA performance standards. These are the state performance standards. And what 1255 says is those standards under state law are allowed to be more stringent than what's under the federal SMACRA. So in conclusion, Your Honor, I would say that by reading the plain text, by looking at the statutory structure, you find that the only possible interpretation of the interplay between the savings clause and the permit shield. Can I ask you something? Yes, Your Honor. I'd like to ask a hypothetical. Assume that Virginia properly issued the Clean Water Act permit in this case. And assume also that Virginia has a state regulation that is more stringent. Would the Clean Water Act permit in that circumstance cover the pollution in state standards? Both SMACRA and the Clean Water Act. No, no. Under the Clean Water Act. Under the Clean Water Act. The Clean Water Act as well authorizes state regulations and state limits more strict than the federal limits. So, yes. I understand that. But my question is if the state issues a permit under the Clean Water Act authority, it has, does that protect it from any claim that it's violating the state provision? So, if I understand your question correctly, you're asking if there could be a separate state action for limits more stringent than the federal action? Any kind of action. In other words, if somebody, a plaintiff, brought an action in Virginia for discharges from point sources into Virginia waters, and they have a permit for that under the Clean Water Act, does that permit protect them from discharges that might violate the state standard? Your Honor, and there's a bit of federalism at play here, the state permit is going to be issued under the federal 402 section under that. So, it is a state and federal permit. So, yes, they would be protected from liability if they were in compliance with that state, federal, national pollutant discharge elimination system for liability under the Clean Water Act or under the state. Okay. Thank you. That's what I thought. And I see my time is up. If there are no further questions, thank you, Your Honor. And, counsel, I'll make sure I'm clear because I have to understand what your concessions are. You got to be careful when you answer questions. Sometimes they will encircle you. So, are you saying that Virginia could not have – can Virginia have broader, you agree, broader restrictions than the permit that's done through the regulatory scheme through the federal government? They could have broader restrictions, correct? They can have more stringent restrictions, yes. So, to answer, to make it clear, you're saying that if point source pollution was regulated strictly under state law, we'll call that sphere A. But sphere B, point source discharge protection, is under the federal one. You're saying that if someone has a permit as to direct discharge on the federal permit in Virginia, even if they violated a discharge under state law only, they would be protected, you're saying? I believe so, Your Honor, because that permit is issued pursuant to Section 402 of the Federal Clean Water Act. Right. So, the discharge can be broader, cannot – obviously, the discharge can be broader, I suppose. You said it doesn't matter whether it's broader or not. Any kind of discharge in Virginia would be shielded as long as you have a valid permit. And, Your Honor, I would caveat that with pointing out that it would have to be in compliance with all conditions of that permit. So, it would have to be in compliance with those more stringent state limitations in the permit to be – to take advantage of that immunity. Exactly. You still look through the lens, right, in terms of the stringency of Virginia's law. It would have to be looked through – dually through those lenses, right? And that's why it's almost – kind of almost impossible to have a direct discharge without it offending both. That's correct, Your Honor. Yeah. Okay. That's what I want to make a clarification. All right. Thank you so much, counsel. We can't come down to our normal tradition and shake your hand. Please know that we appreciate your assistance in these very important things, protecting our nation's waters and also protecting the people who carry on companies under permits. And they're not easy, and we really appreciate your helping us with those. And I hope that you both will be safe and stay well. Thank you. Thank you.
judges: Roger L. Gregory, Paul V. Niemeyer, Julius N. Richardson